Filed 9/22/14  P. v. Newsome CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAYFORD NEWSOME,<br><br>    Defendant and Appellant. | G049816<br><br>(Super. Ct. No. FVI1002057)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Jules E. Fleuret, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Rayford Newsome was convicted of first degree murder and other crimes stemming from a racially-charged confrontation at an apartment complex in San Bernardino County. He contends his trial was unfair because the prosecutor excused an African-American from his jury venire and introduced evidence he had previously committed involuntary manslaughter. Appellant also argues there is insufficient evidence to support his conviction for first degree murder, the conviction must be reduced to voluntary manslaughter because he acted in the heat of passion, and his attorney was ineffective for failing to make certain objections at trial. While we discern no basis to disturb appellant's convictions, he does raise two valid sentencing issues that necessitate a partial reversal and remand for resentencing. In all other respects, we affirm the judgment.

FACTS

Mitchel Welsh managed a small apartment complex in Apple Valley. He also resided in the complex, in unit no. 7, along with his wife and their three young children. On one side of Welsh, in unit nos. 8 and 2, lived his parents and his sisters Tiffany and Trisha. And on the other side, in unit no. 6, lived Andraya Jackson and sisters Courtney and Tamera Denson. Jackson and the Denson sisters, who are black, did not get along with the members of Welsh's family, who are white. In fact, despite being neighbors, there was considerable animosity between the occupants of unit no. 6 and Welsh's family.

One day, Jackson's five-year-old daughter got into a spat with one of Welsh's young nieces in the courtyard of the apartment complex. Jackson and Trisha became involved in the dispute and started arguing so fiercely that they eventually came to blows. When things settled down, Trisha called Welsh and told him what happened. He said he would deal with the situation when he got off work. In the meantime, Trisha and Tiffany continued to argue back and forth with the women in unit no. 6.

Welsh arrived home around dusk and was accompanied by his workmates Michael Subacz and Bobby Organ, who is Welsh's cousin. As the trio made their way into unit no. 7, Jackson and Courtney called Welsh a "motherfucker" and bemoaned the fact they now had to deal with him. Welsh was used to mediating disputes between the occupants of unit no. 6 and his family, but he sensed this particular row was going to be tough to quell.

And he was right. As the arguing intensified, a group of rowdy women showed up at unit no. 6, including a redhead named August. They announced, "We're here, motherfuckers," and told Welsh to "[b]ring the fat bitch out." "It's time for her to catch her fate." Welsh grabbed a baseball bat and started yelling at the women to settle down. However, August snatched the bat away from him and threatened to hit him with it. One of the women also tried to take a large wooden chair that was out in front of unit no. 7, but Subacz held the chair down, preventing her from doing so. Subacz also got the bat from August and put it inside unit no. 7. Fearing for his safety, Organ broke a beer bottle on the ground and kept a piece of it in his hand to keep the women at bay.

Amidst all the commotion, August announced, "Oh, I just called my niggas right now, they're on their way." She told Welsh, "Oh, you gonna get it, white boy, you gonna get it." While there was lots of cursing and name-calling going on between the two groups, no physical violence had erupted up to that point. In fact, things were just starting to settle down when three black men appeared on the scene. Arriving from the parking lot area, Marcus Wade (Jackson's uncle), appellant, and a man known as "Black" walked up to unit no. 6 and asked the women there what was going on. Then they went over and confronted Welsh, Subacz and Organ, who were standing in front of unit no. 7. Accounts differ as to what happened next.

According to Welsh, appellant boisterously asked, "Which one you all nigga's trying to get on these women's head?" When no one answered, he moved closer to Welsh and repeated the question. Welsh told him, "Man, ain't no one fucking saying

3

nothing to these females. Ain't nothing here to fight about, bro, this situation's over." But appellant kept coming closer until he was right in Welsh's face. At that point, Welsh stepped back and lost his footing. Then Wade came around on Welsh's side and surprised him with a punch to the head.

Welsh hit the ground and blacked out momentarily. When he got back up, he saw Subacz and appellant out near the courtyard. Subacz had his hands on appellant's shoulders and it appeared as though they were fighting. While they were "locked up" with each other, Welsh heard a gunshot ring out. He didn't realize it at the time, but appellant had shot Subacz in the chest with a handgun. Welsh ran to Subacz, picked him up off the ground and started running with him. Then appellant trained his gun on Welsh and fired several more shots. That prompted Welsh to let go of Subacz and duck for cover. When the smoke cleared, Subacz was lying on the ground near the parking lot. Welsh tried to give him CPR, but he died at the scene.

In the area where the shooting occurred, investigators found a baseball bat that contained some blood stains, but there was no evidence as to the source of the stains. Welsh did not think that Subacz had anything in his hands when appellant shot him. He did tell the police that he saw Subacz rush toward appellant before the shooting, but at trial he retracted that statement and said that by the time he came to, he just saw them fighting. Welsh admitted on the stand that he himself had previously been convicted of possessing methamphetamine for sale, unlawfully driving a vehicle and giving false information to a police officer.

Organ testified that after Wade punched Welsh, Subacz "jump[ed] out of the doorway" toward appellant. Organ didn't see anything in Subacz's hands, but he did see Subacz leap forward and take a swing at appellant. Asked if Subacz actually landed a punch on appellant before the shooting, Organ testified, "I'm pretty sure he did. I don't see why not."

4

To the contrary, Trisha testified that Subacz was not fighting or arguing with anyone when he got shot. Rather, he was just standing by the doorway, unarmed, when appellant pulled out his gun and fired at him. Following the shooting, Trisha retrieved a bat from her apartment and threw it at appellant. Then she ran into the apartment and called 911. While she was on the phone, she heard three or four more shots.

Wade testified for the prosecution. Although he was charged with the same offenses as appellant, he was allowed to plead guilty to being an accessory after the fact, in exchange for his promise to testify truthfully. The prosecution also agreed to dismiss a petty theft charge Wade was facing in an unrelated case. At the outset of his testimony, Wade admitted his prior record included convictions for grand theft, first degree burglary, unlawfully driving a vehicle and evading the police.

Wade explained that on the day of the shooting, he and appellant were at appellant's residence working on a car when he got word that his adult nieces were involved in a racially-charged confrontation with Welsh's family and that one of his nieces had been hit with a baseball bat. Wade was also informed that there was talk about guns at the scene. When Wade told appellant about the situation, appellant said he wanted to come along and "bring something" with him. At trial, Wade said he didn't know what appellant meant by that, but Wade admitted to the police that he knew appellant was referring to bringing a gun with him.

Wade and appellant drove separate cars to the apartment complex, with Wade picking up Black along the way. When they arrived there, appellant waited in the parking lot while Wade and Black walked up to the scene. They noticed Welsh and Subacz were holding baseball bats behind their backs, while Organ was holding a piece of broken glass in his hand. As Wade was talking to his nieces about the situation, appellant walked up and spoke to Jackson. Then Wade, appellant and Black went over to talk to Welsh's group in front of unit no. 7.

5

During a heated exchange, Welsh called Wade a "nigger" and reared back like he was going to take a swing at him. In response, Wade punched Welsh in the head, knocking him out. After that, racial slurs, bats and sticks began flying out of unit no. 7. Then Subacz came toward Wade with a baseball bat and swung it at his head. Wade ducked out of the way, but in the process bumped appellant, who slipped and fell backwards. Wade saw appellant extend his arm out in front of him and assumed he was trying to break his fall. Then he saw a flash of light from the gunshot and everybody scattered. Moments later, Wade heard two or three more shots, but he did not know where they were coming from.

About 30 minutes after the shooting, Wade went to appellant's apartment to check on him. By that time, appellant had already shaved off most of his hair. Appellant gave Wade the gun, and days later he buried the weapon in a remote location near Victorville.

When the police interviewed Wade, he didn't indicate he was scared about going to the apartment complex and confronting Welsh. In fact, he described himself as a "fighter" and said he was prepared to take on any challengers. Nor did he tell the police that Subacz swung a bat at him before the shooting.

Testifying on his own behalf, appellant stated that when Wade first told him about the ruckus going on at the apartment complex he didn't want to go over there "naked," i.e., unarmed, because the situation sounded serious. So he decided to bring a gun with him "just in case." When they arrived at the complex, he stayed in his car while Wade and Black went to check things out. After a few minutes, Wade came back and told him, "[T]hese white boys they all out here and they got bats and bottles and sticks." At that point, appellant walked over and talked to Jackson, whom he knew through a friend. Jackson said her sister had gotten hit with a bat, and there was lots of name-calling going on. Appellant told her to just turn the other cheek. But rather than doing that himself, he walked over to where Wade and Welsh were arguing and joined the fray.

6

Noticing the people in Welsh's group had bats, bottles and sticks, appellant was a little scared. But that didn't stop him from getting in Welsh's face and mocking him for picking on women and children. Amongst all the commotion, Welsh called Wade a nigger and cocked his arm back. However, Wade struck first, punching Welsh in the side of the head. Then Subacz stepped forward with a baseball bat and swung it at Wade and appellant. They dodged the bat, but Subacz kept swinging it at them. Appellant backed up to avoid getting hit, and in the process, lost his balance and fell in the grass. Then Trisha threw a stick or a bat at him, and he ducked that, too. Meanwhile, Organ was holding a broken bottle by the doorway and appeared as though he was getting ready to attack.

While appellant was still on the grass, Subacz came toward him with the bat and swung it at him yet again. At that moment, appellant raised his gun and it went off. Appellant testified he didn't aim the gun at Subacz or try to shoot him. Over and over again, he described the shooting as an *unintended* reaction to the situation he was facing. However, at other times during his testimony, appellant made it sound like he deliberately shot Subacz in self-defense. For instance, at one point he said, "Before I squeezed the trigger I was frightened. I was scared. I thought [Subacz] was going to hit me with the bat. So I was scared for my life."

Explaining his actions following the initial shot, appellant said that as he was running toward the parking lot, he thought he saw someone chasing him from behind, so he fired two additional shots in the air. Then he ran to his car and drove home. Later that night, Wade came by, and he gave him the gun. Wade told appellant the police were looking for him, and if they ever caught him, they were going to kill him. So, appellant cut off his hair and went on the lam. After spending a couple of nights in a motel with his girlfriend, he went to Las Vegas to hide out at a friend's house. The police tracked him down and took him into custody.

After waving his *Miranda* rights, appellant admitted shooting Subacz. While he initially denied taking a gun to the scene or firing more than one shot, he eventually came clean on those issues, as well. As for why he shot Subacz, appellant first said he "shot him by accident." Then he surmised he might have shot Subacz in self-defense, saying, "I just, I guess it was a defense shot . . . . I guess it was." Throughout the entire interview, appellant waffled back and forth between these two explanations.

During his police interview, appellant also admitted he was a member of the South Side Compton Crips while growing up in Los Angeles. He claimed he quit the gang when he moved to Apple Valley in the early 2000's, but the prosecution presented evidence that he and Wade were active gang members at the time of the shooting. In fact, the prosecutor theorized Wade enlisted appellant to help him confront Welsh's group precisely because he knew appellant was a seasoned gangster who would be willing to "intimidate, fight and shoot" if need be.

Appellant was charged with murdering Subacz in the first degree and attempting to murder Welsh and assaulting him with a firearm. Appellant was also charged with street terrorism and an assortment of gang and firearm enhancements. At trial, the court instructed the jury on self-defense and the lesser included offense of voluntary manslaughter under the theories of heat of passion and imperfect self-defense. The jury was also instructed on the lesser included offense of involuntary manslaughter. The jury acquitted appellant of attempted murder and found the enhancements attendant to that count not true. However, it found appellant guilty of attempted voluntary manslaughter and convicted him as charged on the remaining counts and enhancements. The trial court sentenced him to 74 years to life in prison.

*Jury Selection*

Appellant contends the prosecutor infringed his equal protection rights by using a peremptory challenge against an African-American prospective juror named Cheryl Williams. In appellant's view, the challenge was racially motivated in violation

8

of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). We are not persuaded.

During voir dire, Williams stated she was a divorced mother of two teenage children. She had attended college for four years, but never earned a degree. Her prior jury duty included service on one civil trial and two criminal trials, one of which involved a homicide or assaultive conduct. Williams said she likes jury duty because it gives her a break from her job at the post office.

When the prosecutor asked Williams if she would find it difficult to evaluate the credibility of a witness who behaved in a fashion or used language she did not like, Williams said no. Skeptical, the prosecutor asked her, "You wouldn't shut down your mind if you had kind of a feeling about someone where you just didn't particularly like the way they acted or liked some of the testimony they gave?" Again, Williams answered no. Explaining her answer, Williams said she worked in customer service and was "used to all kinds of language" and people losing their temper. That led to the following exchange:

"Q. [by prosecutor]: And what is your reaction when you're dealing with someone who you feel is losing their temper over something that's trivial?

"A. [by Williams]: Well, they always call me. I'm mild mannered, so I don't really – I kinda don't pay attention to a lot of that. I see 'em, and they do it, and it seems like its allowed if it's given attention; if you don't react, it goes away. But when you react, it gets worse.

"[¶] . . . [¶]

"Q. And if – in your normal course of work when you're dealing with those types of customers, you're able to kind of black out certain things that they say or not pay attention or not react. Would you have that reaction to a witness if you didn't like the things they were saying, and maybe you would have a tendency to black out –

"A. No.

9

"Q. – some of their testimony if you were upset or thought they were losing their temper or thought they handled a situation inappropriately?

"A. No. That was a customer, this is serious. No, I wouldn't do that.

"Q. Okay. So you'd still be willing to evaluate someone's testimony even if they described a situation that you, you know, just thought was wrong or were offended or anything like that?

"A. Yes."

The prosecutor did not challenge Williams initially. But after a few more prospective jurors were questioned, she exercised a peremptory challenge against Williams, and she was excused. That prompted defense counsel to object, at which time the court held a sidebar with counsel. Noting Williams is African-American, defense counsel first pointed out there were no African-Americans on the venire panel that preceded Williams' panel. He then argued there was nothing about Williams' answers that justified her removal, and the only reason the prosecutor excused her is because of her race.

The trial court understood that defense was objecting to both the overall racial composition of the jury venire and Williams' removal in particular. As to the first issue, the court observed that although there were no African-Americans on the first venire panel, seven out of sixty people on Williams' panel were African-American. Because defense counsel did not present any statistical evidence that the percentage of African-Americans on the jury venire was lower than in the greater High Desert area, the court rejected his claim that the venire did not represent a fair cross-section of the community. Appellant does not challenge that ruling on appeal.

As for Williams' removal in particular, the trial judge did not say much. In response to defense counsel's claim that the prosecutor's challenge to Williams was racially motivated, the judge simply stated, "I'll overrule the objection." He did not

10

explain the basis for his ruling or ask the prosecutor for an explanation as to why she challenged Williams.

Nevertheless, the prosecutor volunteered this explanation: "Miss Williams did indicate that in her position as a customer service representative for the United States Postal Service that when she is dealing with people who are using foul language or who have lost their temper, she tends to block out what they are saying and not pay attention. She said in this case she would not do that because it's serious, but she does indicate that's what she does in her regular day-to-day situations as part of her employment."

After thanking the prosecutor for her comments, the trial judge said, "I also note there is another African-American in the jury box in seat No. 12[.]" And with that, voir dire resumed and the parties went about choosing a jury in Williams' absence.

"The three-stage procedure that applies to *Batson/Wheeler* motions is familiar. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" [Citation.]" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 469.)

In arguing he established a prima facie case of discrimination with respect to Williams' removal, appellant claims there were very few African-Americans on the jury venire, Williams' responses showed she could be fair and impartial, and the case had racial undertones. There's no doubt the case was racially charged. But the mere fact the prosecutor targeted a prospective juror who is the same race as appellant does not give rise to an inference of discrimination. (*People v. Harris* (2013) 57 Cal.4th 804, 833-838; *People v. Guerra* (2006) 37 Cal.4th 1067, 1101; *People v. Turner* (1994) 8 Cal.4th 137,

11

167-168, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5; *People v. Trevino* (1997) 55 Cal.App.4th 396, 406.) The fact is, there were seven African-Americans on Williams' venire panel, and when she was dismissed, there was an African-American still seated in the jury box. So there are indications the prosecutor was exercising her peremptory challenges in good faith. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 119; *People v. Turner, supra*, 8 Cal.4th at p. 168.)

Moreover, the prosecutor gave a nondiscriminatory reason for excusing Williams. After engaging Williams in extensive questioning, the prosecutor said she was concerned that Williams might be inclined to tune out some of the witness' testimony in this case, because Williams admitted she "kinda [doesn't] pay attention" to a lot of what her angry customers say to her at work. Although Williams insisted she would not do that during the trial, the prosecutor was not required to accept her claim at face value. (*People v. Taylor* (2010) 48 Cal.4th 574, 643, fn. 19; *People v. Panah* (2005) 35 Cal.4th 395, 441; *People v. Young* (2005) 34 Cal.4th 1149, 1174.) And "the mere possibility that one could draw plausible inferences about [Williams] other than those the prosecutor did does not mean the prosecutor's stated reason was pretextual." (*People v. Thompson* (2010) 49 Cal.4th 79, 108.)

In evaluating appellant's claim of racial targeting, we must keep in mind the prosecutor's explanation "need not be sufficient to justify a challenge for cause" and that "[j]urors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible[.]" (*People v. Turner, supra*, 8 Cal.4th at p. 165.) Considering the totality of the circumstances surrounding Williams' removal, we do not believe the record allows us to reject the trial court's evaluation of the situation and draw an inference she was excused for discriminatory reasons. Therefore, appellant's *Batson/Wheeler* motion was properly denied.

12

*Prior Involuntary Manslaughter Evidence*

Appellant also contends the trial court abused its discretion by allowing in evidence that he had previously committed involuntary manslaughter. Again, we disagree.

As explained above, appellant hedged his story along the lines of self-defense and accident. While claiming to have shot Subacz for fear of being hit with a baseball bat, he also repeatedly insisted the shooting was an unintended accident. In cross-examining appellant about his accident claim, the prosecutor asked him about his experience and knowledge of firearms. Appellant admitted he had possessed and fired guns in the past and had previously been convicted of various firearm offenses. He also admitted he had accidentally shot and killed one of his friends when he was 16 years old. Explaining that incident, appellant said he and his friend were "messing around" with a rifle when the gun suddenly went off. Appellant's friend was killed in the incident, and appellant was charged with murder. However, because the shooting was an accident, the charge was reduced to involuntary manslaughter, and appellant only had to serve "six months in camp."

The trial court was initially inclined to exclude this evidence. But in light of appellant's claim he shot Subacz by accident, the court ultimately determined the evidence was admissible to show appellant's intent and his awareness of the dangerousness of firearms. Indeed, appellant admitted on the witness stand that, after killing his friend with a rifle, he was keenly aware that guns can be deadly. Appellant's knowledge in this regard was relevant to whether he was consciously aware of the risks associated with bringing a gun to the scene of the confrontation. And the prior killing was logically relevant to refute appellant's claim he shot Subacz by accident. Having already gone through the dreadful experience of accidentally killing someone, it stands to reason that appellant would be extra careful not to let that happen again.

Appellant fears the evidence concerning the prior shooting was unduly prejudicial because it revealed that he only had to spend six months in camp for that incident. In appellant's view, the jurors in the present case would have felt this punishment was too lenient and therefore been inclined to convict him out of vengeance, irrespective of the evidence against him. But there was absolutely no evidence that the prior shooting was anything other than an accident. Considering as well that appellant was only 16 years old at the time of that shooting, we do not believe his punishment for that incident would have impelled the jury in this case to convict him simply out of spite or ill will.

Appellant also complains the trial court failed to instruct the jury that the prior shooting could only be used for the limited purpose of ascertaining appellant's mental state and his claim of accident. But because appellant did not ask the court to so instruct the jury, and because the evidence regarding the prior shooting was not a central component of the prosecution's case, the absence of a limiting instruction is not cause for reversal. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1094 and *People v. Collie* (1981) 30 Cal.3d 43, 61 [a limiting instruction concerning the use of other crimes evidence is required only in the rare case where the evidence is dominantly featured, highly prejudicial and minimally relevant].)

All things considered, we do not believe the trial court erred in admitting evidence that appellant had previously been adjudicated of involuntary manslaughter. (See generally *People v. Horning* (2004) 34 Cal.4th 871, 900 [trial court's have "broad discretion" in determining the relevance and potential prejudicial effect of evidence].) Nor did the admission of this evidence lessen the prosecution's burden of proof or render appellant's trial unfair. (See generally *People v. Reliford* (2003) 29 Cal.4th 1007 [no constitutional violation found even though the jury was allowed to use evidence of the defendant's prior crimes to prove he was predisposed to commit the charged offenses]; *People v. Van Winkle* (1999) 75 Cal.App.4th 133 [same].)

*Premeditation and Deliberation*

Next, appellant contends there is insufficient evidence to support the jury's finding he killed Subacz with premeditation and deliberation, so as to support his conviction for first degree murder. We beg to differ.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "'"examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence[.]" [Citations.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) "Although we must ensure the evidence is reasonable, credible, and of solid value," we must keep in mind "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

The three categories of evidence traditionally deemed relevant to the issue of premeditation and deliberation are: 1) Planning activity; 2) facts concerning the defendant's prior conduct with the victim, i.e., motive evidence; and 3) the circumstances surrounding the method of the killing. (*People v. Thomas* (1992) 2 Cal.4th 489, 516-517, citing *People v. Anderson* (1968) 70 Cal.2d 15.) These categories are descriptive, not normative or exhaustive, and are intended "to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) We must remember "premeditation can occur in a brief period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]"

15

(*Id*. at p. 1127.) The question of just "how long a thought must be pondered before it can be said to be premeditated and deliberated" is "fundamentally a question of fact for the jury in each case under proper instructions." (*People v. Bender* (1945) 27 Cal.2d 164, 184; overruled on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110.)

Appellant took a loaded firearm to the scene of a hostile confrontation involving his friend Wade's family and another group of residents. Although appellant claimed he took the gun for protection, both he and Wade were fired up and angry about the situation at the apartment complex. They obviously did not like the idea of their friends and family being harassed and possibly assaulted by the people in Subacz's group. In fact, appellant made this point crystal clear at the scene of the shooting when he got in Welsh's face and mocked him for picking on women and children. Whether justified or not, this shows appellant was acting very aggressively in the moments before the shooting. And once Wade waylaid Welsh, appellant wasted little time pulling his gun and shooting Subacz. Witnesses gave differing accounts as to Subacz's actions before the shooting, but the evidence showed appellant aimed his gun at Subacz and shot him in the chest at close range, indicating he knew what he was doing. Moreover, in the wake of the shooting, appellant did not act like it was an accident or self-defense. To the contrary, the evidence can be read to indicate he fired several more shots toward Welsh, got rid of the gun, cut off his hair and fled the state.

Considering all the circumstances attendant to the shooting, the jury could reasonably conclude appellant acted with premeditation and deliberation when he killed Subacz. There is no reason to disturb the jury's finding in that regard.

### *Heat of Passion*

But were the circumstances surrounding the shooting so emotionally charged as to reduce appellant's culpability below that of murder? Appellant contends they were. In particular, he asserts the prosecution failed to prove he did not kill Subacz

16

in the heat of passion, and therefore his conviction must be reduced to voluntary manslaughter.  We cannot agree.

Voluntary manslaughter is defined as an intentional, unlawful homicide committed upon a sudden quarrel or heat of passion.  (Pen. Code, § 192, subd. (a); *People v. Ochoa* (1998) 19 Cal.4th 353, 422-423.)  In order to satisfy this definition, the killer's sense of reason must be obscured as the result of considerable provocation.  (*Id.* at p. 423.)  Indeed, as the jury was properly instructed in this case, the provocation must be sufficient to "cause[] a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."  (See CALCRIM No. 570.)  The jury was also correctly told the prosecutor had the burden of proving beyond a reasonable doubt that appellant did not kill as a result of sudden quarrel or in the heat of passion.  (*Ibid*.)[1]

In arguing for voluntary manslaughter, appellant contends, "The evidence, viewed in the light most favorable to the prosecution, showed [he] shot Subacz only after Subacz charged at him and either punched him or swung a bat at him.  . . .  The evidence plainly showed appellant acted rashly and without thinking due to fear."  But actually, the prosecution's most favorable eyewitness, Welsh's sister Trisha, testified Subacz was just standing by the doorway of unit no. 7 defenselessly at the time of the shooting.  Although there was evidence to the contrary, she told the jury Subacz did not have anything in his hands and was not moving toward appellant when appellant gunned him down.  Furthermore, while appellant testified he shot Subacz because Subacz was coming at him

---

[1]  In his reply brief, appellant claims these instructions should have been given before the instructions on murder, and by failing to do so, the court improperly directed the jury to decide the murder charges before considering the issue of heat of passion.  However, contrary to appellant's suggestion, the instructions were not worded so as to require an acquittal on the murder charges before allowing the jury to *consider* the lesser offense of voluntary manslaughter.  Rather, they merely restricted the jury from *returning a verdict* of voluntary manslaughter before acquitting on the murder charges, which was entirely proper.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1073, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)  Because the court told the jurors they could consider the various kinds of homicide described in the instructions "in whatever order you wish," appellant's claim is not well taken.

17

with a baseball bat, he also testified – and he told the police – that the shooting was just an accident. Appellant's repeated insistence that he did not *intend* to shoot Subacz seriously undermines his claim he acted as a result of fear or in the heat of passion.

The jury was given the option of convicting appellant of manslaughter, yet it decided his actions constituted first degree murder. We cannot say, as a matter of law, the jury's decision was erroneous. Its implied determination the prosecution disproved the theory of heat of passion beyond a reasonable doubt is supported by substantial evidence.

*Effectiveness of Counsel*

Appellant argues his attorney was ineffective for failing to make certain objections and requests at trial. We disagree.

As a criminal defendant, appellant had a constitutional right to effective assistance of counsel at trial. (U.S. Const., 6th Amend.) In order to prove that right was violated, appellant "'"'must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]"'"' (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Appellant must also affirmatively establish prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To do this, appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

Appellant argues his attorney was ineffective for failing to object to the introduction of appellant's probation report from a prior case. The prosecutor used the report to prove appellant was convicted of possessing a loaded firearm in 2007, which was used as one of the two predicate offenses to support the gang charges. Appellant admits a defendant's prior conviction may be used to prove a predicate offense in support of a gang enhancement. (See *People v. Tran* (2011) 51 Cal.4th 1040, 1046.) However, he insists admission of his *entire* probation report was prejudicial because it included

18

information about his juvenile adjudication for involuntary manslaughter and the traffic stop that led to his 2007 weapons conviction.

Our conclusion on this point is three-fold. First, defense counsel did vigorously, albeit unsuccessfully, object to the probation report coming into evidence. Although counsel's primary argument was that the report contained inadmissible hearsay, he also asserted the report was irrelevant and unduly prejudicial.[2] Second, for the reasons explained above in section II, evidence of appellant's prior involuntary manslaughter adjudication, which he testified about in considerable detail, was relevant to his state of mind at the time of the shooting. And third, the investigating officer in appellant's 2007 weapons case testified regarding the circumstances of the traffic stop that led to appellant's conviction in that case. For all of these reasons, appellant has failed to demonstrate his attorney was ineffective for failing to prevail in his quest to exclude the subject probation report.

Appellant also assails his attorney for not objecting to a statement the prosecutor made in closing argument while she was attempting to explain why the heat of passion theory of voluntary manslaughter was inapt in this case. The prosecutor told the jury, "Mr. Subacz did not provoke [appellant]. And if there was any provocation, it would not be the kind that would cause a reasonable person *to kill*." (Italics added.) However, as our Supreme Court has explained, "provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)

Still, we do not believe the prosecutor's brief and isolated misstatement was prejudicial because the jury was instructed to follow the law as explained to them by the

---

2    Although appellant faults his attorney for failing to keep the probation report out, he does not separately challenge the trial court's decision to allow it in.

19

trial judge. The jurors were also told that if the attorneys' comments on the law conflicted with the judge's instructions, they must follow the judge's instructions. In instructing the jury on the heat of passion doctrine, the court made it clear the provocation sufficient to reduce murder to manslaughter is that which would cause the average person "to act rashly and without due deliberation; that is, from passion rather than from judgment." This is a correct statement of the law, and there is nothing in the record that undermines our confidence the jury applied this standard in reaching its verdict. (See generally *People v. Holt* (1997) 15 Cal.4th 619, 662 [jurors are presumed to understand and follow the trial court's instructions].) While appellant points out the court instructed the jury on the law before closing arguments, we fail to see how that matters. Regardless of the order of events, the jury would have known the court's instructions on the law were controlling over the attorneys' comments.

Next, appellant faults his attorney for not asking the court to refer the jury to the instructions on provocation when it sought clarification on the difference between first degree murder and second degree murder. Without objection by either party, the court responded to the jurors' request by directing them to review the instructions on murder and malice. (See CALCRIM Nos. 520 & 521.) Those instructions explain that the key distinction between first and second degree murder is premeditation and that unless the prosecution could prove appellant acted willfully, deliberately and with premeditation, the jury could not find him guilty of first degree murder.

Appellant does not dispute the propriety of those instructions. However, he claims his attorney should have asked the court to direct the jury to also reread CALCRIM No. 522, which states, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter." It certainly wouldn't have done any harm if the court had done so. But the jury already had that instruction, and if it was confused about the issue of provocation, its question presumably would have mentioned that issue. Instead, its question was aimed at the "exact difference" between

20

first and second degree murder, and as explained in the instructions to which the court directed the jury, that difference is premeditation. While it is true that a first degree murder may be mitigated to second degree murder if the defendant is adequately provoked, as CALCRIM No. 522 makes clear, we do not believe the result of the trial would have been any different had the court directed the jury to review that instruction, as well.

In fact, whether considered individually or as a whole, none of defense counsel's alleged failings undermines our confidence in the verdict. Viewing the record in its entirety, we are convinced appellant was convicted based on the strength of evidence presented against him, and not because of anything his attorney did or did not do. Therefore, we are compelled to reject appellant's Sixth Amendment claim. He has failed to prove he was denied his constitutional right to effective assistance of counsel.

*Sentencing*

That brings us to appellant's sentencing claims. He argues, and the Attorney General admits, the trial court erred in imposing dual enhancements for assaulting Welsh with a firearm, as charged in count 3. The subject enhancements were imposed because appellant used a firearm during that offense. (See Pen. Code, §§ 12022.5, subd. (a) [enhancement for personally using firearm during felony]; 186.22, subd. (b)(1)(c) & 667.5, subd. (c)(8) [enhancement for personally using firearm during gang-related felony].) The parties agree that because a defendant's sentence may not be doubly enhanced for using a firearm during a single offense, the enhancements imposed on count 3 cannot stand, and the matter must be remanded for resentencing on that count. (Pen. Code, § 1170.1, subd. (f); *People v. Rodriguez* (2009) 47 Cal.4th 501, 508-510.)

There is also an issue as to whether appellant is entitled to additional presentence credit for the eight days he spent in custody in Las Vegas before being extradited to California. Appellant argues he should be given credit for that period of custody because it appears to have stemmed from his conduct in the present case.

21

However, as the Attorney General points out, a defendant seeking credit for a particular period of presentence custody must affirmatively demonstrate that custody is solely attributable to the conduct for which he was sentenced. (*People v. Bruner* (1995) 9 Cal.4th 1178, 1191.) We agree with the Attorney General that this factual question is best addressed to the trial court on remand. (See *In re Marquez* (2003) 30 Cal.4th 14, 19 [recognizing that even seemingly simple credit determinations "can reveal hidden complexities"].)

DISPOSITION

The sentence enhancements imposed on count 3 are stricken, and the matter is remanded for resentencing on that count and for the trial court to determine whether appellant is entitled to any additional presentence credit. In all other respects, the judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

FYBEL, J.